**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NECA LLC, *et al.*, | Civil Action No. 23-3863 (SDW) (MAH) |
| Plaintiffs, | |
| v. | **OPINION** |
| JAZWARES, LLC, *et al.*, | May 27, 2026 |
| Defendants. | |

**WIGENTON**, District Judge.

Before this Court are Defendants Jazwares, LLC and Kelly Toy Holdings, LLC's (collectively, "Defendants") Motion for Summary Judgment (D.E. 104) pursuant to Federal Rule of Civil Procedure ("Rule") 56(a); and Plaintiffs NECA LLC and Kidrobot, LLC's (collectively, "Plaintiffs") Motions *in Limine* (D.E. 103 & 108).[1]  Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1332(a), 1338, 1367(a) and 15 U.S.C. § 1121.  Venue is proper pursuant to 28 U.S.C. § 1391(b).  This opinion is issued without oral argument pursuant to Rule 78 and Local Civil Rule 78.1.  For the reasons stated herein, Defendants' Motion for Summary Judgment and Plaintiffs' Motions *in Limine* are **DENIED**.

I.     **FACTUAL BACKGROUND**[2]

---

[1] Citations to "D.E." refer to docket entries in the Court's Electronic Case Filing System for this matter and any internal citations contained therein.

[2] Consistent with Rule 56(c), this Court considers the parties' Statement of Material Facts ("SOMF") and any responses thereto, as well as the depositions and documents in the record.  Where a party failed to

As this case demonstrates, beneath the innocent and playful smile of the modern plush toy lurks a thicket of intellectual property law.  The crux of this case is whether Defendants' use of several allegedly infringing marks on its plush toys infringed on Plaintiffs' unregistered "HUGME" mark, used in connection with Plaintiffs' plush toys.

Plaintiff NECA LLC ("NECA") creates, markets, and distributes licensed consumer products based on movies, video games, comic books, and pop culture.  (D.E. 126-1 ¶ 75.)  NECA operates through subsidiary companies such as Plaintiff Kidrobot, LLC ("Kidrobot"), a "creator and dealer of limited-edition art toys."  (*Id.* ¶ 78.)  As early as October 26, 2017, Plaintiffs launched their "HUGME" line of toys consisting of "'HUGME' branded plush toys based on a variety of licensed characters," such as SpongeBob, Disney's Lilo and Stitch, and Trolls characters, which they have since sold continuously.  (*Id.* ¶¶ 2, 79–80; D.E. 1 ("Compl.") ¶ 12.)  Plaintiffs also license characters from horror-oriented franchises for their "HUGME" line, but design those toys "in a way that the character[s] do[] not appear scary."  (D.E. 126-1 ¶ 43.)  Plaintiffs' "HUGME" toys are characterized by the "shake feature," such that products in this line "vibrate when [a] user claps or squeezes the toy," making it so that a hug, among other actions, trigger this feature.  (D.E. 126-1 ¶¶ 11, 16.)

Defendants Jazwares, LLC ("Jazwares") and Kelly Toy Holdings, LLC ("Kelly Toys") own and sell a line of plush toys known as "Squishmallows."  (*Id.* ¶ 19.)  At issue in this litigation is Defendants' use of the marks "HUGMEES," "COCOMELON HUGMEES BY SQUISHMALLOWS," "HUG MEES BY ORIGINAL SQUISHMALLOWS," and "SQUISHMALLOWS HUG MEES" ("Infringing Marks"), on Defendants' Squishmallow Hug Mees line of toys.  (Compl. ¶ 30.)  "Classic" Squishmallows have a round form; Squishmallow

---

counter a material fact in accordance with Local Rule 56.1's requirements, this Court deems that fact as undisputed for purposes of the Motions.

Hug Mees "have a more traditional plush body" and "feature outstretched arms and legs." (D.E. 126-1 ¶ 37.)

The parties dispute when Defendants first began selling their Hug Mees toys line.[3] By June 13, 2019, however, Kelly Toys filed a trademark registration application with the United States Patent and Trademark Office ("USPTO") for the mark "SQUISHMALLOWS HUG MEES." (D.E. 109-63, Munoz Decl., Ex. 125 at 73.) This mark was registered on the Principal Register as of February 22, 2022 and bears United States Registration Number 6654108. (*Id.*) Less than two months later—on April 13, 2022—Kelly Toys also sought to register the mark "HUG MEES BY ORIGINAL SQUISHMALLOWS" ("the '430 Application"). (D.E. 109-63, Munoz Decl., Ex. 126 at 80.) The mark was published on March 21, 2023, yet registration remains pending. (*Id.*) The USPTO's trademark search feature reflects that the mark was published for opposition, "at which time one or more oppositions were filed but they have not yet been decided." United States Patent and Trademark Office, https://tmsearch.uspto.gov/search/search-results/97362430 (last accessed May 17, 2026).

Plaintiffs claim that it was not until February 2023[4] that they heard of Defendants' use of "HUG MEES BY SQUISHMALLOWS." (D.E. 126-1 ¶ 30.) Plaintiffs claim that upon learning of Defendants' use in February 2023, they sent Defendants a Cease-and-Desist Letter ("C&D Letter") dated March 29, 2023. (D.E. 120-2, Koral Decl., Ex. 234 at 964.) That same day, Kidrobot filed a trademark registration application for the mark "HUGME." (D.E. 1-2, Ex. B at 2.)

---

[3] Defendants submit they began selling Squishmallows Hug Mees in November 2018. (D.E. 126-1 ¶ 20.) Plaintiffs dispute this on the grounds that "[t]he revenue information produced by Defendants did not show any revenue earned on HUG MEES until May 2019." (*Id.*)

[4] Defendants dispute this and claim it was in March 2023. (D.E. 126-1 ¶ 30.)

On March 27, 2024, USPTO issued a Nonfinal Office Action via email to Plaintiffs' counsel.  (D.E. 120-2, Koral Decl., Ex. 232 at 946.)  The USPTO refused Plaintiffs' registration of the "HUGME" mark "because of a likelihood of confusion" with two marks—Australia Brilliance's "HUG ME NOW" mark and Kelly Toys's "SQUISHMALLOWS HUG MEES" mark. (*Id.* at 947.)  Applying the factors in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357 (C.C.P.A. 1973), the USPTO reasoned Plaintiffs' mark is confusingly similar to Defendants' mark because "HUG MEES" is "phonetically and visually similar," thus "creat[ing] a very similar commercial impression"; Plaintiffs' goods are closely related to Defendants' goods; and Plaintiffs' "identification encompasses [Defendants'] identification in its entirety."  (*Id.* at 948–49.)

## II.    PROCEDURAL HISTORY

On July 19, 2023, while their trademark registration application was pending before the USPTO, Plaintiffs initiated suit in this Court.[5]  (D.E. 1.)  Plaintiffs assert the following causes of action:  federal common law trademark infringement pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count One); federal unfair competition, false designation of origin, and false advertising under 15 U.S.C. § 1125(a) (Count Two); cancellation of registration and abandonment of the '430 Application pursuant to 15 U.S.C. §§ 1119 and 1052(d) (Count Three); and common law trademark infringement, unfair competition, false designation of origin pursuant to New Jersey law (Counts IV through VII).  (Compl. at 9–17.)

Following protracted discovery, Plaintiffs moved to exclude Defendants' experts Mark Keegan and Richard Brady's testimony and their reports by filing motions *in limine* on October 1, 2025.  (D.E. 103, 108.)  That same day Defendants moved for summary judgment.  (D.E. 104.) The parties timely completed briefing for all pending motions.

---

[5] This matter was reassigned to the Undersigned on October 24, 2023.  (D.E. 20.)

### III.    LEGAL STANDARDS

#### A.  Motions *in Limine*

"Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984).  Courts rule on pretrial *in limine* motions to "shield the jury from unfairly prejudicial or irrelevant evidence." *Faragalla v. Otundo*, 626 F. Supp. 3d 783, 785 (D.N.J. 2022) (quoting *Ebenhoech v. Koppers Indus., Inc.*, 239 F. Supp. 2d 455, 461 (D.N.J. 2002)).  Motions *in limine* "foster[] efficiency for the court and for counsel by preventing needless argument at trial." *Ebenhoech*, 239 F. Supp. 2d at 461.  However, "[t]he Federal Rules of Evidence embody a strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact." *Holbrook v. Lykes Bros. Steamship Co.*, 80 F.3d 777, 780 (3d Cir. 1996) (internal quotation marks omitted).

"Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'" *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)).  Federal Rule of Evidence 702[6] and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) govern the admissibility of expert testimony.  Expert

---

[6] The Rule reads:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

testimony is admissible if: (1) the proffered witness is an expert, (2) the expert testifies about matters requiring "scientific, technical, or specialized knowledge, i.e., reliability," and (3) the expert's testimony assists the trier of fact, "i.e., fit." *United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (brackets omitted) (quoting *Pineda*, 520 F.3d at 244). The proffering party must demonstrate the expert's testimony is admissible which requires showing the testimony is reliable by a preponderance of the evidence. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

## B. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes this showing, the burden shifts to the nonmovant who "must set forth specific facts showing that there is a genuine issue for trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–

6

89 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)). Although courts view all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, the nonmoving party cannot simply rely on the "mere allegations or denials of his pleadings." *Id.* at 288 (quoting *Cent. Dauphin*, 765 F.3d at 268). Similarly, "[b]are assertions, conclusory allegations, or suspicions will not suffice." *Id.* at 288–89 (quoting *Cent. Dauphin*, 765 F.3d at 269). If the nonmoving party fails to make an adequate showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

## IV.   DISCUSSION

This Court addresses the pending motions *in limine* first and then turns to the remaining motion for summary judgment. For the reasons detailed below, all motions are denied.

### A. Motion *in Limine* to Exclude Richard Brady, Ph.D.[7]

Richard Brady, Ph.D., was asked by Defendants to provide "an economic evaluation of and, if called upon, to testify concerning" Plaintiffs' HugMe products. (D.E. 112-1, Koral Decl., Ex. 1 at 9.) In his initial report, Brady evaluated data on units shipped and gross sales earned from 2017 to 2023 to determine what percentage of Kidrobot's annual net sales were attributable to Kidrobot's HugMe and Phunny plush lines. (*Id.* at 16, 21, 24.) Based on sales statistics, Brady opined that "the Kidrobot HugMe line is a relatively minor portion of Kidrobot's business when compared to the Phunny line of products." (*Id.* at 25.) Then Brady assessed what percentage of the total United States plush toy marketplace Plaintiffs' HugMe and Defendants' Squishmallows comprised. (*Id.* at 26.) Based on sales statistics, as well as other information, Brady concluded "the HugMe line has been a relatively insignificant contributor to the stuffed animal and plush toy market." (*Id.* at 10, 27.) Lastly, Brady analyzed data on HugMe sales by customer from 2017 to

---

[7] Given that this opinion does not address the disgorgement issue, *see infra*, discussion of Plaintiffs' expert James Donohue's report and Brady's rebuttal in response thereto are omitted.

2023 to conclude Target is "the largest purchaser of HugMe products, but the HugMe line of products comprise an insignificant portion of Target's estimated overall toy sales." (*Id.* at 10, 29.)

Plaintiffs move to exclude Brady's report and testimony. Plaintiffs argue that Brady's opening expert report is unhelpful to the trier of fact because it does not "in any way" bear upon the issues to be tried in this case. (D.E. 110 at 8.) More specifically, Plaintiffs maintain that the opening report is irrelevant to the elements of the claims they raise since its focus is on analyzing the HugMe line's share of Plaintiffs' profits and overall business. (*Id.*) Plaintiffs' challenges to Brady's report are better suited for trial, however. While it is unlikely that all of Brady's opinions will be admissible at trial, it is premature for this Court to exclude his report and testimony writ large when upon review of the report's contents, the information contained therein appears both relevant and reliable. *See Kannankeril*, 128 F.3d at 806 (stating that the Rules of Evidence "embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact[,]" with Rule 702 having "a liberal policy of admissibility"). Brady's opening report is relevant to the secondary meaning and likelihood of confusion inquiries. Further, given that Plaintiffs' challenges go to the weight of the evidence and that Plaintiffs' counsel have deposed Brady, should Defendants choose to utilize his report at trial, Plaintiffs can avail themselves of their ability to cross-examine Brady at that time. Plaintiffs' Motion is therefore denied. *See Berkelhammer v. ADP TotalSource Grp., Inc.*, No. 20-5696, 2026 WL 867136, at *14 (D.N.J. Mar. 30, 2026) (denying motion to exclude an expert where the movant's arguments focused on the weight, rather than the expert's testimony admissibility).

### B. Motion *in Limine* to Exclude Expert Mark Keegan

Plaintiffs similarly seek to preclude Defendants from utilizing the testimony and report of Mark Keegan, Defendants' survey expert.

8

Defendants asked Keegan to develop a consumer survey to assess the extent to which there is a likelihood of confusion between the parties' marks among "Relevant Consumers," which Keegan defined as individuals 18 years of age or older who indicated they had purchased plush toys in the last year or expected to do so within the next six months. (D.E. 111-1, Ex. 1 at 6, 11.) Keegan utilized a Squirt sequential lineup design to expose a test cell group and a control cell group to Amazon product page screenshots for Plaintiffs' Stitch product, Defendants' Gavyn the Yellow Donkey product, and two non-infringing plush toys.[8] (*Id.* at 12–19.) In the test cell group, survey respondents saw the mark "HUG MEES" in the product name for Defendants' toy; in the control cell group the name read "HEE HEES" instead. (*Id.* at 16, 20.)

The survey was conducted online, using an opt-in non-probability sample, which Keegan states "is standard for trademark surveys used in litigation." (*Id.* at 23.) The survey presented the questions and answer choices in a randomized fashion, featured masking items, and used an attention filter question, fraud detection measures, and distractor questions. (*Id.* at 23–26.) In the test cell group, 39.1 percent of respondents indicated a belief that the parties are the same company, affiliated, or that Defendant is sponsored or approved by Plaintiff. (*Id.* at 29.) In the control cell group, this percentage was 36.7. (*Id.*) A net confusion score of 2.4 percent was calculated by subtracting the control cell group score from the test cell group score to account for marketplace noise. (*Id.* at 29–30.) Given the 2.4 percent net confusion score, Keegan opined there was no material likelihood of confusion, explaining that the minimum threshold score to find a likelihood of confusion is approximately 15 percent. (*Id.* at 29–30.)

---

[8] Squirt surveys are a type of survey named after the type used in *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980). *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 233 (3d Cir. 2017). A Squirt survey places two products side by side, "often with other products that serve as controls, and participants are asked questions to determine if confusion exists as to the source of the products." *Id.*

As with Brady's report, Plaintiffs' grounds for challenging Keegan's report go to the weight of the evidence. In essence, based on their own expert's report and conclusions, Plaintiffs question the manner in which Keegan conducted his survey. Plaintiffs contend Keegan's survey failed to present the marks in "real-life market conditions" given that the parties' marks only took up 0.1 or 0.2 percent of the image area. (D.E. 103 at 11–12.) Plaintiffs also take issue with the fact that Keegan's survey did not consider brick-and-mortar sales and only featured Amazon, as opposed accounting for other online sales channels. (*Id.* at 13–14.) Plaintiffs' expert, Robert Palmatier, Ph.D., also conducted a Squirt format survey, but featured the toys' hangtags in the images used. (*See generally* D.E. 109-39, Ex. 90.) The jury should be able to hear and consider both experts' reports and testimony and weigh the competing surveys accordingly. As with Brady, Plaintiffs can challenge Keegan's survey methodology on cross-examination.

## C. Motion for Summary Judgment

Defendants' Motion focuses on Plaintiff's trademark infringement claim.[9] The Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, provides federal statutory protection for trademarks, which serve to secure a mark owner's business goodwill and "protect the ability of consumers to distinguish among competing producers." *United States Pat. & Trademark Off. v. Booking.com B.V.*, 591 U.S. 549, 552 (2020) (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985)). The Lanham Act also establishes a system of federal trademark registration. *Id.*

---

[9] The elements required to prevail on Plaintiff's remaining federal and state law claims "are identical to those required by federal law under the Lanham Act," such that this Court's adjudication of the federal trademark infringement claim is dispositive as to the former. *See J & J Snack Foods Corp. v. Nestle USA, Inc.*, 149 F. Supp. 2d 136, 157 (D.N.J. 2001) (concluding the plaintiff's was unlikely to succeed on its common law trademark infringement and unfair competition claims and New Jersey statutory unfair competition claims due to its failure to demonstrate a likelihood of success on its federal trademark infringement claim); *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) ("We measure federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), by identical standards.").

Trademark registration is not mandatory but does confer owners with valuable benefits, such as "constitut[ing] 'prima facie evidence' of [a] mark's validity," and "serv[ing] as 'constructive notice of [a] registrant's claim of ownership." *Iancu v. Brunetti*, 588 U.S. 388, 391 (2019) (first quoting 15 U.S.C. § 1115(a), then quoting 15 U.S.C. § 1072).  However, "[e]ven without federal registration, a mark may be eligible for protection against infringement under both the Lanham Act and other sources of law." *Booking.com*, 591 U.S. at 553.

To establish trademark infringement under the Lanham Act, a plaintiff must prove that "(1) the mark is valid and legally protectable, (2) it owns the mark, and (3) the defendant's use of the mark is likely to create confusion concerning the origin of goods or services." *E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 191 (3d Cir. 2008).

### 1. Is the "HUGME" mark valid and legally protectable?

The validity and level of legal protection afforded to a particular mark is determined based on the type of mark it is.  *See Booking.com*, 591 U.S. at 553–54.  "Distinctiveness is often expressed on an increasing scale:  Word marks 'may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful.'"  *Id.* at 553 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).  Marks that constitute a common descriptive name and that "refer[] to the genus of which the particular product is a species" are generic; these are at the "lowest end of the distinctiveness scale." *Park 'N Fly*, 469 U.S. at 194; *Booking.com*, 591 U.S. at 554.  Descriptive marks "describe[] the qualities or characteristics of a good or service" and "must achieve significance 'in the minds of the public' as identifying the applicant's goods or services—a quality called 'acquired distinctiveness' or 'secondary meaning'" to be placed on the USPTO's Principal

Register.[10] *Park 'N Fly*, 469 U.S. at 194; *Booking.com*, 591 U.S. at 553 (quoting *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000)).

Arbitrary, fanciful, and suggestive terms are the "most distinctive marks," making them *per se* protectable. *Booking.com*, 591 U.S. at 553. Suggestive terms "suggest rather than describe the characteristics" of a good. "Arbitrary or fanciful marks use terms that neither describe nor suggest anything about the product; they 'bear no logical or suggestive relation to the actual characteristics of the goods.'" *A & H Sportswear*, 237 F.3d at 221 (quoting *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986)). Suggestive terms "suggest rather than describe the characteristics of the goods." *Canfield*, 808 F.2d at 296.

Defendants argue that Plaintiff's "HUGME" mark is generic or at best descriptive but lacking secondary meaning, such that they "cannot establish any enforceable trademark rights" and this Court should grant summary judgment. (D.E. 105 ("Mov. Br.") at 20.) Plaintiffs argue that their mark is suggestive. (D.E. 120 ("Opp. Br.") at 20.) Alternatively, Plaintiffs contend that if this Court finds "HUGME" to be descriptive, there are triable issues of fact as to whether the mark has acquired secondary meaning that would preclude this Court from granting summary judgment. (*Id.* at 22–24.) Whether "HUGME" is generic, descriptive, or suggestive, and whether that term has acquired secondary meaning are questions of fact. *See E.T. Browne*, 538 F.3d at 192. Thus, this Court considers whether there is a genuine issue of material fact as to those questions.

    a.   *"HUGME": Generic, Descriptive, or Suggestive?*

        i.   *"HUGME" is not Suggestive*

---

[10] Registration on the Principal Register comes with "valuable benefits" for a mark's owner, such as "a presumption that the mark is valid." *Booking.com*, 591 U.S. at 552; 15 U.S.C. § 1057(b). The USPTO's Supplemental Register "contains other product and service designations," but only affords "more modest benefits." *Id.* at 552–53.

12

A term is suggestive "if it requires imagination, thought or perception to reach a conclusion as to the nature of goods." *Canfield*, 808 F.2d at 297 (quoting *Stix Prods., Inc. v. United Merchants & Mfrs., Inc.*, 295 F. Supp. 479, 488 (S.D.N.Y. 1968)).  Plaintiffs maintain that "HUGME" is suggestive because "in isolation the name provides virtually no information about the nature of the product itself," noting that "HUGME" could be descriptive of a wide range of things such as cozy clothing, furniture, baby related goods or services, elder care, dating services, or therapeutic services, among others.  (Opp. Br. at 20–21.)

Plaintiffs rely on *Strike Holdings LLC v. US Strikes, LLC*, No. 05-1023, 2005 WL 1799412, at *4 (E.D. Pa. July 28, 2005), to bolster their argument.  There, the court concluded that the plaintiff's mark "STRIKE," which was used in connection with the plaintiff's high-end bowling and entertainment facilities, was suggestive.  *Id.*  The court came to this conclusion after reasoning consumers had to employ their imaginations or perception to determine "STRIKE" was associated with bowling—as opposed to the myriad of other contexts the term might be found.  *Id.*  *Strike Holdings* is distinguishable on two grounds, however.  First, the plaintiff's marks were already federally registered but had yet to reach "incontestable" status under the Lanham Act.  *Id.* at *3. Second, the matter was before the court on a motion for a preliminary injunction.  *Id.* at *2.  At this stage in the litigation, Plaintiffs cannot just offer mere argument; they must point to concrete evidence in the record demonstrating other products, such as furniture or baby related goods, utilize "HUGME."  Plaintiffs have not done so, which is detrimental to their argument.  *Cf. Canfield*, 808 F.2d at 297–98 (rejecting the plaintiff's argument that "chocolate fudge" as applied to diet soda was suggestive because there was evidence in the record "that many food products" had the same designation and that, contrary to the plaintiff's argument, some of these products

13

utilized the term as related to flavor, instead of texture). Thus, this Court turns to consider whether Plaintiffs' mark is generic or descriptive.

### ii.    Generic versus Descriptive

"A mark is 'generic' when it is a common descriptive name for a class of products, not connected to any specific brand, and has not been afforded trademark protection." *J & J Snack Foods Corp. v. Nestle USA, Inc.*, 149 F. Supp. 2d 136, 145 (D.N.J. 2001). "The dominant principle for determining whether a term is generic is the primary significance test." *Canfield*, 808 F.2d at 299. Under the primary significance test, "a term is generic unless 'the primary significance of the term in the minds of the consuming public is not the product but the producer.'" *Novartis Consumer Health, Inc. v. McNeil-PPC, Inc.*, No. 99-280, 1999 WL 707721, at *8 (D.N.J. 1999) (quoting *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118 (1938)). The trademark need not identify a source directly or explicitly. *Canfield*, 808 F.2d at 300. To satisfy the test, a term must signify a product that emanates from a single source, i.e., a product brand. *Id.* at 301. But if the product that emanates from a single source is not only a product brand but also a product genus, then the test is not satisfied. *Id.* The primary significance test does not differentiate a product brand from a product genus. *Id.*

The *Canfield* court held that "chocolate fudge" as applied to diet soda was generic. *Id.* The court reasoned that "chocolate fudge" operated as a "common descriptive explanation" of the functional difference between a mere chocolate soda, an established product class, and a soda tasting like chocolate fudge. *Id.* at 308. In *Novartis*, the court applied the primary significance test, as interpreted by the Third Circuit in *Canfield*, and concluded the plaintiff's "softchew" mark was generic. 1999 WL 707721, at *10. The court identified the relevant product genus as "soft, chewable tablets" given that plaintiff's product "differed from the other types of chewable tablets

14

on the market" because it was softer. *Id.* Then, it examined plaintiff's competitors' need to use the term "softchews" and determined marks such as QUICKLETS, KIDMED, KIDMELT, WOWTAB, and FLASH DOSE—which were commonly used by competitors on fast-dissolving tablets—did not "effectively communicate[] the functional information" that those tablets were soft and chewable. *Id.*

Defendants submit that Plaintiffs' unregistered mark is generic for a few reasons. (Mov. Br. at 21–25.) They submit "HUGME" is "a common way of describing plush toys," evidenced by the ubiquity of the phrase in the marketplace in the names, product descriptions, and advertising of plush toys—which they note Plaintiffs knew of given their commissioning of a "Trademark Research Report" in 2017.[11] (Mov. Br. at 21–22 (citing D.E. 109, Munoz Decl., Ex. 48).) Relying on *Novartis*, Defendants also claim "HUGME" is generic "because it directly names the very trait that defines plush toys—their huggability." (Mov. Br. at 23.) Lastly, Defendants contend that granting protection to "HUGME" would give Plaintiffs control over a fundamental product attribute, thereby burdening competitors by denying them the ability to easily communicate to consumers that their products should be hugged. (Mov. Br. at 24.)

Defendants have not met their initial burden of demonstrating there is no genuine issue of material fact as to whether "HUGME" is generic. Unlike in *Canfield* and *Novartis*, where the marks at issue functionally distinguished the products they were on from other marks used so as to render the marks at issue generic, there is no showing here as to how the "HUGME" mark—and only "HUGME" alone—renders the plush toys it is on functionally different. There are other ways to describe plush toys and their ability to be hugged, namely: "plush," "soft," "huggable," "squishy," or "squeezable." (D.E. 126-1 ¶ 9.)

---

[11] Plaintiffs dispute the utility of the 2017 "Trademark Research Report." (D.E. 126-1 ¶ 7.)

15

At the same time, Plaintiffs have demonstrated a genuine issue of material fact as to whether "HUGME" is descriptive.  A descriptive mark "describes the qualities or characteristics of a good or service" and has achieved secondary meaning.  *Park 'N Fly*, 469 U.S. at 194.  "Secondary meaning is established when the plaintiff shows that the mark 'is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services.'"  *Nestle*, 149 F. Supp. 2d at 151–52 (quoting *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000)).  The following non-exclusive list of factors is used when evaluating whether a mark has achieved secondary meaning in this Circuit:

> (1) the extent of sales and advertising that leads to consumer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and (11) actual confusion.

*Id.* at 152.

Plaintiffs have raised genuine disputes of material facts as to several factors.  Although Kidrobot tracks marketing and advertising costs at the brand level and not the product level, there is evidence in the record demonstrating the "HUGME" line represented an increasing share of Kidrobot's sales, with total "HUGME" product sales through 2023 being over $9 million.  (D.E. 126-1 ¶¶ 23–24.)  There is also a genuine issue of material fact as to length of use.  Defendants claim they had plush toys branded "Hug Me" as early as 2016.  (*Id.* ¶ 4.)  Plaintiffs dispute this fact and assert they began selling their toys in 2017.  (D.E. 126-1 ¶ 2.)  Plaintiffs also contest Defendants' assertion that Jazwares employees "did not know about HUGME products until this dispute began, at least four years after Squishmallows HUG MEES were created" and whether Squishmallows' creator designed Defendants' product with knowledge of Plaintiffs' product, which is relevant to factor four.  (D.E. 126-1 ¶¶ 35–36.)

16

In sum, Defendants have failed to demonstrate there is no genuine issue of material fact as to whether Plaintiff's mark is generic and Plaintiffs have raised material issues of fact as to whether their mark has secondary meaning and is therefore descriptive.  Given the genuine issues of material fact, this Court cannot grant Defendants summary judgment.

### 2.  Is Defendants' "HUG MEES" Mark Likely to Create Confusion?

Even if Defendants could show no genuine issue of material fact as to the first element of Plaintiff's trademark infringement claim, genuine issues of material fact exist as to whether there is a likelihood of confusion.  The following factors—known as the *Lapp* factors[12]—are utilized in this Circuit to assess the likelihood of confusion between marks:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
>
> (2) the strength of the owner's mark;
>
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
>
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
>
> (5) the defendant's intent in adopting the mark;
>
> (6) evidence of actual confusion;
>
> (7) whether the goods are marketed through the same channels of trade and advertised through the same media;
>
> (8) the extent to which the targets of the parties' sales efforts are the same;
>
> (9) the relationship of the goods in the minds of consumers; and
>
> (10) other facts suggesting the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in

---

[12] The Third Circuit initially considered these factors as applied to non-competing goods in *Interpace Corporation v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983), but later extended their application to competing goods in *A & H Sportswear*.  237 F.3d at 213–15.

the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*A & H Sportswear*, 237 F.3d at 215.  The inquiry is qualitative; not all factors are relevant in all cases and some may weigh more than others in a particular case.  *Id.*

As it stands, this case is rife with contested facts that are material to the likelihood of confusion inquiry.  For example, while both companies occupy the plush toys market, Defendants characterize their products as being for pre-school aged children and Plaintiffs' products as for children eight years or older.  (D.E. 126-1 ¶¶ 38–39.)  Meanwhile, Plaintiffs argue—based on evidence such as Jazwares's former product developer and designer Jeanne Yoon's deposition— that Defendants' products appeal to a much wider age range.  (Opp. Br. at 36–37 (citing D.E. 120-2, Koral Decl., Ex. 217); D.E. 126-1 ¶ 81.)  A jury could find that age is relevant to the seventh inquiry, among other *Lapp* factors.  *See Checkpoint Sys., Inc. v. Check Point Software Tech., Inc.*, 269 F.3d 270, (3d Cir. 2001) ("The 'relatedness' analysis is intensely factual.  Goods may fall under the same general product category but operate in distinct niches.").

Similarly, price is a contested issue.  (D.E. 126-1 ¶ 59.)  Plaintiffs submit their HUGME products "typically sell for between $15 and $35," but Defendants present evidence that Plaintiffs' product price is higher, which is relevant to the third and seventh *Lapp* factors.  *See Versa Prods. Co. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 204 (3d Cir. 1995) ("Inexpensive goods require consumers to exercise less care in their selection than expensive ones.  The more important the use of a product, the more care that must be exercised in its selection.").  Lastly, as discussed above, there is the issue of competing expert reports based on consumer surveys conducted using the same Squirt-style design.

Based on the evidence before it, this Court concludes there are genuine issues of material fact to be resolved by a jury which bar the entry of summary judgment.

**D. Disgorgement**

Plaintiffs seek the equitable remedy of disgorgement. "Profit disgorgement 'does not follow as a matter of course upon the mere showing of an infringement.'" *Lontex Corp. v. Nike, Inc.*, 107 F.4th 139, 159 (3d Cir. 2024) (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 209 (3d Cir. 1999)). Rather, courts decide the propriety of disgorgement by considering the six, non-exclusive factors set forth in *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168 (3d Cir. 2005), on a "case-by-case basis." *Id.* (quoting *Holland v. Florida*, 560 U.S. 631, 649–50 (2010)). Given that this matter is ripe for a jury trial, the issue of disgorgement is premature and will be addressed by this Court in due course, if appropriate.

**V.    CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment (D.E. 104) and Plaintiffs' Motions *in Limine* (D.E. 103 & 108) are **DENIED**. An appropriate order follows.

    /s/ Susan D. Wigenton    
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:  Clerk
cc:    Parties
      Michael A. Hammer, U.S.M.J.